# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-20-00152-CV

---

### C. C. F., Appellant

### v.

### Texas Department of Family and Protective Services, Appellee

---

### FROM THE 98TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-FM-18-004819, THE HONORABLE DARLENE BYRNE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

C.C.F. ("Mother") appeals from the trial court's final decree terminating her parental rights to her daughter "June," who was almost eighteen months old at the time of trial.[1] We will affirm the trial court's termination decree.

## PROCEDURAL AND EVIDENTIARY SUMMARY

On August 8, 2018, the Texas Department of Family and Protective Services filed its original petition seeking conservatorship over June, who was one-week old. The Department attached an affidavit supporting removal by Department investigator Dakotah Garza, who

---

[1] For the sake of the children's privacy and for clarity, we refer to appellant as "Mother" and to the child and other family members by pseudonyms. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8. The child's alleged father's rights were also terminated, but neither the father's appointed attorney nor the Department could locate him throughout the proceeding, he did not participate in the proceeding, and he did not file a notice of appeal. There was no evidence presented as to the father beyond brief testimony about efforts made to find him.

averred that the Department received a report that Mother, who had been living at a homeless shelter, had to have an emergency C-section after being found "collapsed in an alley," severely dehydrated. June was initially unresponsive and then "had increased heart rate causing her to be on a cpap machine." Further, June's meconium tested positive for cocaine. June stayed in the neonatal intensive care unit (NICU) for several days until the hospital determined that she was healthy and could be discharged "in the next few days." However, a hospital social worker voiced concerns that Mother could not care for herself or June, noting that Mother was homeless, had a deformed hand due to an aneurism in 1999 that rendered her left arm immobile, and used a wheelchair or medical scooter. Medical staff had been assisting Mother with "her own feedings, bathing, and using the restroom," and staff told Garza that Mother "was not able to hold the baby on her own or provide for her basic needs." Finally, Garza stated, Mother had only visited June once for fifteen minutes in the first three days June was in the NICU.

Garza stated that she interviewed Mother, who said she had been diagnosed with anxiety, depression, and post-traumatic stress disorder but had not been taking medications for the previous eleven weeks. Mother had struggled with homelessness for many years, had been living at a homeless shelter in Austin before giving birth, was "unwilling to return" to the shelter, and did "not know where she will be living" after being discharged from the hospital. Mother also told Garza that she did "not have any type of assistance or support to care for" June, nor did she have "any supplies to care for [June] after being discharged from the hospital." Mother admitted that she drank beer occasionally while she was pregnant but denied drug use in the last twelve years, despite June's meconium test. Garza averred that there were "serious concerns for [Mother's] untreated mental health and substance abuse" and that Mother was "paranoid and had delusional beliefs." Garza spoke to Mother's sister, "Tina," who lives in Florida and is the

2

caregiver for Mother's older son, "Cliff." Tina "voiced many concerns for [Mother's] untreated mental health," saying that Mother had "refused mental health care and medications for many years." She also reported that because of mobility and physical limitations, Mother had not been able to keep up with Cliff starting when he was three or four years old. On August 8, the trial court signed an ex parte order appointing the Department as temporary managing conservatorship and setting a hearing for August 21.

In mid-August, the Department filed with the trial court a report stating that on Friday, August 10, Mother met with a Department investigator at the hospital and indicated that she was willing to accept Department assistance so she might have visitation with June. She also said she would enter into a long-term care facility if approved and asked the investigator to find out the facility's rules for visitation. The next Monday, however, the investigator discovered that Mother had called three times over the weekend, demanding an immediate response, and then left the hospital against medical advice. The investigator left Mother a message on her last known phone number. A report filed on August 30 indicated that the Department had sought assistance in locating Mother but had been unable to find her. The trial court extended its ex parte orders and reset the hearing on conservatorship to mid-October 2018.

A hearing on temporary orders was held October 12, and it appears from the record that Mother did not attend. The trial court signed temporary orders about two weeks later, ordering Mother to successfully complete a parenting class, maintain monthly contact with her Department caseworker, complete a psychological evaluation, complete a drug and alcohol evaluation, and submit to random drug testing. The order provided that Mother could have up to two hours of supervised visitation with June at Mother's request. After the hearing but before the order was signed, Mother's appointed attorney filed an answer and "Counter-Petition"

3

asserting a defense under Section 161.001(d). *See* Tex. Fam. Code § 161.001(d) (court may not order termination based on failure to comply with court order if parent proves by preponderance of evidence that she (1) was unable to comply with specific provisions of order and (2) made good faith effort to comply and failure to comply is not attributable to parent's fault).

The Department filed a report in December 2018 explaining that on October 4, Mother had met with the Department to complete her family safety plan and that the Department had since been trying to contact her with little success. The report stated that Mother had refused to disclose her location and that when a caseworker finally spoke to her on December 4, Mother hung up before finalizing plans for a meeting and did not call back. Mother did not appear at the December 2018 permanency hearing, during which the trial court ordered her to participate in visitations with June and again ordered that she complete a psychological evaluation and follow all recommendations, complete a drug and alcohol evaluation and follow all recommendations, successfully complete a parenting class, submit to random drug testing, and maintain regular contact with her caseworker. An April 2019 report stated that Mother had not participated in any visits or completed any services and that her current whereabouts were unknown. A July 2019 report stated that Mother was incarcerated in Tarrant County; had been "transferred to the mental health wing" of the facility, where she was receiving treatment; and had not completed any services or sought visitation. The Department's last report filed in November 2019, about a month before trial, stated that Mother was still incarcerated in Tarrant County; that a caseworker had met with her to discuss June's placement and Mother's required services; that Mother "expressed concerns regarding her family being motivated to be a placement option for [June] because of her trust fund"; and that Mother had not had any visits or completed any services, although she "expressed interest" in the jail's recovery support group and bible class.

4

Mother participated in the January 2020 final hearing telephonically because she was being held in the North Texas State Hospital. Caseworker Cursten Row testified that the Department sought custody because June's meconium test was positive at birth and because of concerns that Mother could not care for the child. Row stated that Mother left the hospital against medical advice and had not had any contact with June since then. Row explained that Mother had been ordered to maintain contact with the Department and to do a psychological evaluation, drug testing, and a drug and alcohol assessment but "didn't complete any of that." Row also testified that she had tried to communicate with Mother throughout the case and that Mother "is aware of what the orders are." Row said that Mother was arrested in mid-February 2019 for assault with a deadly weapon after she poured scalding water on a man and exhibited a knife and that Mother had been found incompetent twice during the course of that criminal case.

June was placed in her current foster home upon her release from the hospital, and Row testified that the foster home was "a loving home" and that the parents "have raised her up until this point from birth in an excellent way." Row stated that she had had "limited communication" with Mother and that although she and June's foster parents had sent pictures and letters, Row felt she had "been like forcing interaction kind of through letters." Row testified that it was in June's best interest for Mother's rights to be terminated because the foster parents have been communicative while Mother has not even maintained contact, saying, "[W]here [June] is placed now, I feel like it is the best home for her to be." The child's guardian ad litem also believed termination was in June's best interest and further testified:

> I also would ask that the rights of mom be terminated as the Department is requesting. She has not been able or willing to provide for this child throughout the course of the year. I understand from her testimony today that that is not the

5

way that she wanted things to go, and I respect that very much. But as she said, being the biological parent, you know, is her reason for not wanting her rights terminated. But we have seen, over the course of this case which has been a long one with the extensions that, since the date of that child was brought home from the hospital, her real parents have been there for her every day taking care of her. Her foster mother regularly sends out photos of her to absolutely anyone and everyone, look at this amazing, adorable baby, so we have all on this case enjoyed that very much. And I had the chance to visit with her in her home several times and observed her with these parents. She—when she gets tired, she holds onto her dad's ear, that's her tell, and he calls her "love." And she is a very happy, confident, smart little baby. . . . So she is just a very joyful child and she is being very well cared for.

Mother testified from the state hospital via telephone, saying:

I am a good parent. I have a—I also have an elder son who is 13 years old who currently resides with his father due to my current incarceration here at North Texas State Hospital. But I am a good parent all and all. I am competent. I am coherent. I am aware of my surroundings. I have family who supports me. I have a job. I have my own place. I have food and shelter to provide for my children. And I, also, am a viable part of my community. I am a model citizen. And I believe my rights should not be terminated on the basis that I am the biological parent.

Mother said, "I am not—what [Row] is saying, I don't know what she said, but I am not that person." Mother's attorney argued that Mother had "suffered an aneurism as a young child which has severely affected her mobility, and so under the Americans with Disabilities Act she is entitled to reasonable accommodations." The attorney noted that "[o]ne of the *Holley* factors is programs available" and said, "I don't believe there is any evidence of that, and so therefore, I would ask that her rights remain intact."

The court signed a final decree determining that Mother had failed to comply with a court order establishing requirements necessary to regain custody and that termination was in June's best interest. *See* Tex. Fam. Code § 161.001(b)(1)(O), (2).

**DISCUSSION**

On appeal, Mother argues that (1) the evidence is legally insufficient to support termination under Paragraph (O) because she was not offered accommodations under the Americans with Disabilities Act (ADA), *see* 42 U.S.C. §§ 12111-12213; and (2) the evidence is factually insufficient to support the trial court's best-interest determination.

The family code disallows termination under Paragraph (O) for a parent's failure to comply with a court order if the parent proves by a preponderance of evidence that she "was unable to comply with specific provisions of the court order" and that she "made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent." Tex. Fam. Code § 161.001(d). Mother argues that she could not have completed her services while she was committed, that there were no services available while she was hospitalized or jailed, and, therefore, that "there is a strong argument that the Appellant in this case was unable to comply, and she made a good faith effort to comply, but she could not comply with the court orders." She further argues that she, through her attorney, "pleaded and proved findings sustaining an affirmative defense" based on the ADA. *See In re B.L.M.*, 114 S.W.3d 641, 649 (Tex. App.—Fort Worth 2003, no pet.) ("ADA complaint is in the nature of an affirmative defense"); *In re C.M.*, 996 S.W.2d 269, 269-70 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (contention that parent could not comply due to special needs was affirmative defense that must be pled and proven).

Mother's Counter-Petition asserted that termination was not permitted under Paragraph (O) because she could not comply with specific provisions of the court order, made a good faith effort to comply, and her failure to comply was not attributable to any fault on her part. *See* Tex. Fam. Code § 161.001(d). Mother further pled:

> [Mother] contends that she has been or anticipates being diagnosed with a mental health illness or mental health disorder requiring the need for accommodations in accordance with the Americans with Disabilities Act.

> [Mother] contends that the standard service plans issued to parents in cases involving the Department of Family and Protective Services is ineffective, inappropriate, and/or unworkable. [Mother] contends that she will need the Department, in accordance with its own guidelines and policies to adhere to the Americans with Disabilities Act, to make certain, necessary accommodations for her so that her service plan and the services that she receives are effective, appropriate, workable, and accessible.

However, Mother did not identify any specific provisions of the court order that were unworkable, explain how her mental illness was interfering with her efforts to comply, allege that her physical disability was interfering with any efforts, or provide any details or evidence related to her assertions.

At the final hearing, Mother, through her attorney, questioned Row about the Department's awareness of Mother's physical disability but did not ask further questions that might be relevant to Mother's Subsection (d) defense. Before Mother testified on her own behalf, the Department's attorney expressed concerns because "she has been found incompetent legally as part of her criminal case," and Mother's attorney responded, "I am aware of that. I still feel like my client has the right to address the Court and I—and just basically explain why she believes that her parental rights should not be terminated." Mother then testified, stating that she was incarcerated at the North Texas State Hospital and insisting she was competent, coherent, and a good parent. She also claimed that the Department's description of her was wrong and concluded with, "People have been told that I have a disability." Neither the Department nor Mother's attorney asked any questions of Mother. Mother did not present documentary evidence or call any other witnesses.

8

On this record, although Mother's pleadings and argument at the final hearing raised the issue of a Subsection (d) defense, she presented no evidence about any efforts she made to comply with the court order and did not explain how her physical disabilities or mental illness interfered with such efforts. Mother did not prove by a preponderance of the evidence that services were unavailable to her while incarcerated or that she made any attempts to comply with the court's order between October 2018, when the temporary orders were signed, and February 2019, when she was arrested for assault.

Nor does Mother establish her affirmative defense on appeal. She asserts on appeal that she "could not have completed her services while she was committed; there were no services offered to her while she was in the state hospital or while she was in jail," and states:

> In this case, where the Appellant has a disability, and the Department did not offer accommodations, if the parent can prove they tried to comply and were simply unable to comply, then the trial court cannot order termination. Thus the Appellant's rights should not have been terminated because she has an affirmative defense that the Department did not effectively defend against under [Subsection (d)].

Other than referring to her attorney's trial argument that there was no evidence of reasonable accommodations, Mother's brief does not cite to the record for factual support.

Simply pleading a Subsection (d) defense is not enough. Mother also had the burden of establishing by a preponderance of the evidence that she was unable to comply, that she made a good faith effort to comply, and that her failure to comply was not attributable to any fault on her part. *See id.* She did not carry that burden, and we therefore must overrule her first issue on appeal. *See In re I.T.*, No. 01-18-01013-CV, 2019 WL 1996515, at *7 (Tex. App.— Houston [1st Dist.] May 7, 2019, no pet.) (mem. op.) (mother did not "put on evidence of an

9

inability or a good-faith effort to comply with the family services plan"); *In re A.J.H.*, No. 01-18-00673-CV, 2019 WL 190091, at *7 (Tex. App.—Houston [1st Dist.] Jan. 15, 2019, no pet.) (mem. op.) (father "did not put on evidence that he was unable to comply with the specific provisions of the court order, that he made a good faith effort to comply with the order, and that his failure to comply with it is not attributable to his fault"); *see also W.C. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-19-00713-CV, 2020 WL 1281643, at *5 (Tex. App.—Austin Mar. 18, 2020, pet. denied) (mem. op) (father argued he could not complete services while incarcerated but "evidence also showed that he did not comply with the court-ordered services during the time period that the case was pending and he was not incarcerated. The trial court, as the trier of fact, reasonably could have resolved credibility issues and conflicts in the evidence against W.C. to discredit W.C.'s testimony about the reasons that he did not comply with the court order and to find that W.C.'s own fault was attributed to his failure to comply."). We overrule Mother's challenge to the trial court's finding of statutory grounds under Paragraph (O).

As for Mother's second issue, challenging the trial court's best-interest finding, we review the evidence under well-established standards, giving "due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014). In evaluating legal sufficiency, we look at "all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so" and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* In considering factual sufficiency, we review

the entire record, asking whether the "disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id.*

Best interest is evaluated in light of *Holley v. Adams*, which requires that courts take into account the children's wishes, their emotional and physical needs now and in the future, present and future emotional or physical danger posed to the children, the parenting skills of those seeking custody, any programs available to assist those seeking custody to promote the children's best interest, plans for the children's future, the stability of the home or proposed placement, conduct by the parent that might show that the parent-child relationship is inappropriate, and any excuses for the parent's conduct. 544 S.W.2d 367, 371-72 (Tex. 1976); *see In re E.N.C.*, 384 S.W.3d 796, 807 (Tex. 2012). There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006).

Mother's arguments as to best interest are as follows:

> [I]t is not clear that the trial court could find that it was in the best interest of the child, for the Appellant's rights to be terminated because there was little evidence about number five in the *Holley* factors, specifically, programs available to assist the parent seeking custody.
>
> ***
>
> In this instance, the evidence for best interest is factually insufficient for termination; the caseworker testified that the Appellant suffered an aneurism as a teenager, was in a coma, and had long-term effects on the left side of her body. She indicated that the Appellant needed a walker to walk, at points in time. There was no evidence presented as to accommodations for the Appellant. In this case, the court could not have found best interest under the Texas Family code because of the absence of programs available to the Appellant, under the *Holley* factors. So, because of the lack of evidence, the facts do not indicate that the factual grounds were met, nor would they support a clear indication that it was in the child's best interest to terminate [her] mother's parental rights. Thus, the Appellant C.C.F.'s rights should not have been terminated.

(Citations and record references omitted.)

Mother's emphasis on the lack of evidence about programs available to her, however, overlooks the fact that the *Holley* factors are not exhaustive, not all factors must be proved, and "[t]he absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child." *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). Instead, we consider all of the evidence relevant to the *Holley* factors and ask whether "on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights would be in the child's best interest." *Id.* at 28. The children's need for permanence is the paramount consideration when determining their present and future physical and emotional needs. *L.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-18-00125-CV, 2018 WL 3059959, at *1 (Tex. App.—Austin June 21, 2018, no pet.) (mem. op.); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.). A parent's rights may not be terminated merely because the children might be better off living elsewhere, but the factfinder may consider whether termination and adoption versus an impermanent foster-care arrangement would better serve the children's best interest. *See L.R.*, 2018 WL 3059959, at *1.

In this case, the evidence established that June was born after an emergency C-section when Mother, who was homeless, was found collapsed in an alley, and that June's meconium tested positive for cocaine. Mother's physical limitations raised concerns among medical staff about whether she could care for a child. Upon June's release from the NICU, the child was placed with her foster family, with whom she was closely bonded. She was doing well in their care, and her foster home was the only home she had ever known. Mother checked

12

herself out of the hospital against medical advice soon after June was born and had not seen June since then. Mother did not make progress on her safety plan, such as taking steps to address her mental health issues; had not taken any drug tests; refused to tell the Department her whereabouts; had not maintained regular contact with the Department; was arrested for assault with a deadly weapon about six months after June was born; and was at the time of the hearing confined in the state hospital. There was no evidence about any special needs June might have and no specific testimony related to programs available to Mother or the foster parents.

Bearing in mind that June's need for permanence is our first priority, *see id.*, and considering the entire record, we hold that the trial court could reasonably have formed a firm conviction or belief that termination of Mother's rights was in June's best interest, *see C.H.*, 89 S.W.3d at 28. We hold that the evidence is factually sufficient to support the trial court's finding that termination of Mother's parental rights was in June's best interest. *See, e.g.*, *M.R. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-17-00715-CV, 2018 WL 1023899, at *3 (Tex. App.—Austin Feb. 23, 2018, no pet.) (mem. op.) (if child is too young to articulate desires, court can consider evidence of his relationship with foster family and that child has bonded with foster family, "is well cared for by them, and has spent minimal time with a parent"; parent's current and future incarceration is relevant to her ability to meet child's needs; parent's incarceration at time of trial "makes his future uncertain"); *W.D. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-14-00581-CV, 2015 WL 513267, at *5-6 (Tex. App.—Austin Feb. 5, 2015, no pet.) (mem. op.) (weighing mother's history of drug use, including while pregnant, and criminal history in favor of termination); *In re N.L.D.*, 412 S.W.3d 810, 819 (Tex. App.—Texarkana 2013, no pet.) ("parent's inability to provide adequate care for her child, lack of parenting skills, and poor judgment may be considered when looking at the child's best interests," and parent's drug abuse

"is also a factor to be considered in determining a child's best interests").  We overrule Mother's second issue on appeal.

## CONCLUSION

Having overruled Mother's issues on appeal, we affirm the trial court's decree of termination.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Baker and Triana

Affirmed

Filed:  August 19, 2020